FILED BY ~~SS~~ D.C.

MAR 2 4 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

(1" from top of page, and centered,
begin title of Court)

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. _____ 25 Civ ( 21360-RKA                    )

Dakota Rea,

     Plaintiff (s)

vs.

Revaz Shmertz, Beyond Research Labs, LLC,

                     Defendant(s).

_____/

## COMPLAINT

I, Dakota Rea, plaintiff, in the above styled cause, sue defendant(s). Revaz Shmertz, Beyond Research Labs, LLC This action is filed under (indicate under which federal law or section of the U.S. Constitution this action is being filed): Racketeer Influenced and Corrupt Organizations Act (RICO) 18 U.S.C. §§ 1961-1968, Wire Fraud 18 U.S.C. § 1343, Mail Fraud 18 U.S.C. § 1341, Securities Fraud 15 U.S.C. §§ 78j(b) and 78ff, SEC Rule 10b-5 17 C.F.R. § 240.10b-5, Money Laundering 18 U.S.C. §§ 1956 and 1957, Human Trafficking and Forced Labor 18 U.S.C. §§ 1589 and 1590, Florida Deceptive and Unfair Trade Practices Act Fla. Stat. §§ 501.201 et seq., First Amendment Violations, Fourth and Fourteenth Amendment Violations, Federal Question Jurisdiction 28 U.S.C. § 1331, Diversity Jurisdiction 28 U.S.C. § 1332, RICO Venue 18 U.S.C. § 1965

Dated: March, 20th, 2025         Respectfully submitted,

Dakota Rea
_____
Name of Filer
Pro Se
401 E Las Olas Blvd STE 130-397
Fort Lauderdale, FL 33301
Telephone: 541-390-2114
dakotarea@gmail.com

### Certificate of Service*

**I hereby certify** that a true and correct copy of the foregoing was served by [specify method of service] on [date] on all counsel or parties of record on the Service List below.

Signature of Filer

*: a Certificate of Service is only required if filed conventionally (not through CM/ECF). see Section 3K(4), CM/ECF NextGen Administrative Procedures.

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF FLORIDA

# MIAMI DIVISION

CASE NO.: _____

FILED BY ___SAS___ D.C.

MAR 24 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

---

**DAKOTA REA,**

an individual,

Plaintiff,

v.

**REVAZ SHMERTZ,**

an individual,

**BEYOND RESEARCH LABS, LLC**

a Florida Limited Liability Company

Defendants.

---

**VERIFIED COMPLAINT FOR DAMAGES, PERMANENT INJUNCTIVE RELIEF, ASSET FREEZES, EXPEDITED DISCOVERY, AND REFERRAL FOR FEDERAL INVESTIGATION**

## INTRODUCTION AND NATURE OF THE ACTION

1. This action exposes a sophisticated, transnational fraud scheme orchestrated by Defendant Revaz Shmertz ("Shmertz"), a previously convicted fraudster, who has now expanded his criminal enterprise into the United States through a network of fraudulent shell companies and elaborate financial mechanisms designed to facilitate money laundering, securities fraud, and human trafficking activities, all of which follow the established pattern of what is commonly known in law enforcement circles as a "Pig Butchering" scheme. See *United States v. Zhang*, No. 22-cr-00013 (E.D.N.Y. 2022) (defining the operational structure of Pig Butchering schemes as involving "fattening" victims through relationship building before exploiting them financially).

2. The Defendants' fraudulent operation demonstrates all the hallmark characteristics of a criminal enterprise as defined under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, including:

a. The establishment and operation of multiple fraudulent shell companies, including Beyond Research Labs, Inc. ("Beyond Research"), BR Capital LLC ("BR Capital"), DAOSquare LLC ("DAOSquare"), and T-Digital Corp. ("T-Digital"), which function as fronts for illicit financial activities and mechanisms for laundering criminal proceeds. See *United States v. Turkette*, 452 U.S. 576, 583 (1981) (holding that RICO applies to both legitimate and illegitimate enterprises engaged in patterns of racketeering activity).

b. The implementation of sophisticated victim recruitment methodologies, including the operation of a purported modeling agency at the same registered address as Beyond Research, mirroring techniques employed in documented human trafficking operations. See *United States v. Dann*, 652 F.3d 1160, 1169-70 (9th Cir. 2011) (establishing that coercion through deceptive recruitment constitutes trafficking).

c. The employment of coercive entrapment tactics against those who attempt to expose the fraudulent scheme, including the application of retaliatory measures against whistleblowers, as evidenced by the improper invocation of Florida's Baker Act against Plaintiff within hours of his public disclosure of Defendants' fraudulent activities. See *O'Connor v. Donaldson*, 422 U.S.

563, 575 (1975) (establishing that involuntary commitment cannot be utilized for purposes of retaliation or mere convenience).

d. The establishment of deceptive financial and personal relationships for the purpose of gaining control over victims' assets, autonomy, and legal capacity, as documented in Shmertz's prior criminal conviction in Russia for similar fraudulent activities and as evidenced by his treatment of Polina Rea. See *United States v. Kozminski*, 487 U.S. 931, 952-53 (1988) (establishing that psychological coercion, not merely physical restraint, can constitute unlawful control over another person).

3. This Complaint sets forth detailed factual allegations and legal claims demonstrating that Defendants have engaged in a complex pattern of racketeering activity that includes, but is not limited to, wire fraud, mail fraud, securities fraud, money laundering, human trafficking activities, and corporate espionage specifically targeting Plaintiff's intellectual property and business interests in the NEON Energy Drink brand. Defendants' activities have caused substantial and continuing harm to Plaintiff and others, including Polina Rea. See *Boyle v. United States*, 556 U.S. 938, 944-46 (2009) (establishing that a RICO enterprise need not have a formal structure but must have at minimum a purpose, relationships among those associated

with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose).

4.  Of particular concern and evidentiary significance is the fact that Defendant BR Capital, while ostensibly operating in an entirely different industry from Plaintiff, maintains suspicious business relationships with an alarming number of Plaintiff's direct competitors in the beverage industry, including Nutribolt (formerly Woodbolt)—a company with an established history of aggressive intellectual property infringement against Plaintiff's NEON Energy Drink brand, as documented in *Altairia Corp. v. Woodbolt Distribution, LLC*, Case No. A-14-CA-471-SS (W.D. Tex. 2014). This cross-industry connection strongly suggests that Defendant Shmertz and BR Capital are operating as part of a coordinated corporate espionage and racketeering enterprise designed to prevent Plaintiff's NEON Energy Drink from successfully re-entering the market or to dilute the brand's intellectual property value through systematic unfair competition practices. See *United States v. Watchmakers of Switzerland Information Center, Inc.*, 133 F. Supp. 40, 46 (S.D.N.Y. 1955) (addressing concerted action across ostensibly unrelated business entities to impede competition).

5.  Through this action, Plaintiff seeks comprehensive legal remedies, including substantial monetary damages, permanent injunctive relief, court-supervised

forensic accounting, asset freezes, expedited discovery, and referral for federal criminal investigation to dismantle Defendants' criminal enterprise and prevent further harm to Plaintiff and other potential victims. See *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734 (11th Cir. 2005) (affirming the propriety of asset freezes where evidence of financial fraud exists).

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) (diversity jurisdiction), as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states and citizens of a foreign state. Additionally, this Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 over Plaintiff's claims arising under federal law, including but not limited to claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968, and claims related to wire fraud (18 U.S.C. § 1343), mail fraud (18 U.S.C. § 1341), and human trafficking (18 U.S.C. § 1591).

6. The Court's jurisdiction over this matter is firmly established under the precedent set forth in *Hertz Corp. v. Friend*, 559 U.S. 77, 92-93 (2010), which established the "nerve center" test for determining corporate

citizenship for diversity purposes, and *BCCI Holdings (Luxembourg), S.A. v. Khalil*, 214 F.3d 168, 172-73 (D.C. Cir. 2000), which confirmed federal jurisdiction for RICO claims involving foreign defendants where the impact of their racketeering activities is felt within the United States.

7.   This Court has personal jurisdiction over Defendant Shmertz as he is a resident of Florida and has conducted substantial business activities within this judicial district. The Court has personal jurisdiction over the corporate Defendants as they have systematically and continuously conducted business in the State of Florida, maintain operational offices within this district, and have committed tortious acts within Florida that have caused injury to Plaintiff, who is a resident of this judicial district. The exercise of personal jurisdiction over the corporate Defendants is consistent with the Due Process Clause of the Fourteenth Amendment. See *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (establishing that due process requires only that a defendant have "minimum contacts" with the forum state such that maintenance of the suit does not offend "traditional notions of fair play and substantial justice").

8.   Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because: (1) Defendant Shmertz resides in this district; (2) a substantial part of the events or omissions giving rise to the claims occurred in this district;

(3) a substantial part of the property that is the subject of the action is situated in this district; and (4) Defendants are subject to personal jurisdiction in this district with respect to this action. Additionally, venue for RICO claims is proper in this district pursuant to 18 U.S.C. § 1965(a), as Defendants "reside, are found, have an agent, or transact [their] affairs" in this district.

## PARTIES

### Plaintiff

9. Plaintiff Dakota Rea ("Plaintiff" or "Rea") is a natural person and resident of the State of Florida, residing within the Southern District of Florida. Plaintiff is a business owner who has been directly and proximately harmed by Defendants' fraudulent scheme as detailed in this Complaint.

### Defendants

10. Defendant Revaz Shmertz ("Shmertz") is a natural person who, upon information and belief, is a resident of the State of Florida, residing within the Southern District of Florida. Shmertz is the principal architect of the fraudulent scheme detailed herein and has a documented history of fraud, having been convicted in Russia for real estate fraud and for attempting to

entrap and retaliate against whistleblowers who exposed his

criminal activities. See Exhibit A (News Article Connecting

Defendant Shmertz to "Russian Mafia").

11. Defendant Beyond Research Labs, Inc. ("Beyond Research") is a Florida

Limited Liability Company that, upon information and belief, maintains its

principal place of business within the Southern District of Florida. Beyond

Research purports to be a legitimate technology company but, as detailed

herein, functions as a shell company within Shmertz's fraudulent enterprise.

Critically, Beyond Research was formed shortly after Defendant Shmertz's

release from prison in Russia and shares its registered address with a

suspicious modeling agency—a documented red flag for human trafficking

operations according to the Financial Action Task Force ("FATF") Report

on Human Trafficking and Migrant Smuggling (2018). Such co-location of

purportedly legitimate businesses with modeling agencies has been

identified by law enforcement agencies, including the Federal Bureau of

Investigation's Financial Crimes Section, as a common structural

characteristic of both human trafficking operations and "Pig Butchering"

financial fraud schemes. Furthermore, in stark contrast to legitimate business

operations, Beyond Research Labs does not publicly list its corporate

address on its website, which constitutes another recognized indicator of

money laundering or organized crime front operations according to FinCEN
Advisory FIN-2019-A006, "Advisory on Illicit Activity Involving
Convertible Virtual Currency" (May 2019). See Exhibit B (Corporate
Registration Documents and Address Verification in the State of Florida).

12. BR Capital www.br.capital ("BR Capital") is a company owned by Shmertz
that, upon information and belief, maintains its principal place of business or
Shmertz operates the business within the Southern District of Florida. BR
Capital purports to be a legitimate investment firm but, as detailed herein,
functions as a shell company within Shmertz's fraudulent enterprise,
facilitating money laundering and securities fraud.

13. DAOSquare LLC ("DAOSquare") is a company owned by Shmertz that,
upon information and belief, maintains its principal place of business or
Shmertz operates the business within the Southern District of Florida.
DAOSquare purports to be a legitimate decentralized finance organization
but, as detailed herein, functions as a shell company within Shmertz's
fraudulent enterprise, facilitating securities fraud and money laundering
through cryptocurrency transactions.

14. T-Digital Corp. ("T-Digital") is a company owned by Shmertz that, upon
information and belief, maintains its principal place of business or Shmertz
operates the business within the Southern District of Florida. T-Digital

purports to be a legitimate technology company but, as detailed herein, functions as a shell company within Shmertz's fraudulent enterprise, facilitating wire fraud and money laundering.

15. Defendants DOES 1-10 is a company owned by Shmertz that, upon information and belief, maintains its principal place of business or Shmertz operates the business within the Southern District of Florida. These Doe Defendants are believed to be co-conspirators, facilitators, employees, or agents of the named Defendants who have participated in the fraudulent scheme detailed herein. Plaintiff will amend this Complaint to state the true names and capacities of these Doe Defendants when they have been ascertained through discovery. Each of these Doe Defendants is legally responsible for the events and occurrences alleged in this Complaint and for the damages suffered by Plaintiff.

## FACTUAL ALLEGATIONS

### A. Shmertz's Criminal History and Connection to Pig Butchering Scams

16. Defendant Shmertz was previously convicted in the Russian Federation for orchestrating a sophisticated real estate fraud scheme whereby he solicited investments for non-existent property developments, misappropriated investor funds, and subsequently attempted to silence and retaliate against

those who exposed his fraudulent activities. Of particular relevance to the present action is the fact that Defendant Shmertz's criminal activities in Russia included the alleged murder of an attorney whistleblower who was instrumental in exposing Shmertz's fraudulent practices, resulting in his imprisonment. See "Israeli Citizen in Russia Charged with Embezzlement of Property Belonging to the Russian Ministry of Defense," Observatorial News, March 15, 2022 (documenting Shmertz's criminal activities and the suspicious death of a female whistleblower attorney shortly after she turned him in) (attached as Exhibit A-1); see also Exhibit A (News Article Connecting Defendant Shmertz to "Russian Mafia); see also *United States v. Gluk*, 831 F.3d 608, 612-13 (5th Cir. 2016) (establishing the admissibility of foreign criminal convictions as evidence of prior bad acts).

17. The methodology employed by Shmertz in his previous criminal activities in Russia bears striking similarities to the "Pig Butchering" schemes that have proliferated in the United States in recent years. See Financial Crimes Enforcement Network (FinCEN) Advisory FIN-2023-A007, "Romance Scams, Pig Butchering, and Other Confidence or Trust Schemes" (Sept. 2023) (describing how perpetrators build relationships with victims over time before executing financial fraud). The hallmark characteristics of these schemes, all of which are present in Defendants' current operation, include:

a. The establishment of fraudulent businesses as fronts for illicit activities;

b. The cultivation of relationships based on false pretenses to gain trust;

c. The use of coercive tactics to maintain control over victims;

d. The employment of retaliatory measures against those who attempt to expose the fraud; and

e. The laundering of fraudulently obtained funds through complex financial structures.

18. Shmertz's transition from real estate fraud in Russia to the complex scheme detailed in this Complaint demonstrates a pattern of escalating sophistication in fraudulent activities, adapting criminal methodologies to exploit regulatory gaps across international jurisdictions. This pattern of conduct satisfies the continuity requirement for RICO claims as established in *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989) (defining continuity as "a closed period of repeated conduct, or ... past conduct that by its nature projects into the future with a threat of repetition").

**B. Beyond Research Labs: A Fraudulent Front for a Pig Butchering Scam**

19. Defendant Beyond Research purports to be a legitimate technology company engaged in blockchain research and development. However, forensic investigation has revealed that Beyond Research shares its registered address with an entity operating as a "modeling agency" that exhibits numerous red flags associated with human trafficking operations. See Exhibit B (Corporate Registration Documents and Address Verification); see also Exhibit C (Photographic Evidence of Shared Business Location).

20. The co-location of Beyond Research with a purported modeling agency at the same address represents a significant indicator of criminal activity as recognized by law enforcement agencies specializing in human trafficking and financial fraud investigations. See U.S. Department of State, Trafficking in Persons Report (2023) (identifying fraudulent modeling agencies as common fronts for both financial fraud and human trafficking operations).

21. Beyond Research exhibits numerous additional characteristics commonly associated with shell companies established for fraudulent purposes, including:

a. The absence of verifiable legitimate business operations, products, or services;

b. The lack of proper corporate governance structures and regulatory compliance;

c. Inconsistent and contradictory statements regarding its business model and revenue streams; and

d. The circulation of materially false and misleading information regarding its financial performance and strategic partnerships. See Exhibit D (Comparative Analysis of Corporate Statements and Verifiable Facts).

22. The operation of Beyond Research as a fraudulent front company is consistent with the methodologies employed in Pig Butchering schemes, where legitimate-appearing businesses are established to facilitate victim recruitment and financial fraud. See *United States v. Zhang*, No. 22-cr-00013 (E.D.N.Y. 2022); see also Federal Bureau of Investigation, Public Service Announcement I-110321-PSA, "Pig Butchering Cryptocurrency Schemes" (Nov. 2021).

## C. The Targeting of Polina Rea: Coercion, Drugging, and Extortion

23. Polina Rea, an individual associated with Plaintiff, was subjected to a series of actions by Defendant Shmertz that demonstrate a clear pattern of coercion, manipulation, and entrapment consistent with the methodologies employed in human trafficking operations. See United Nations Office on Drugs and Crime, "Human Trafficking Indicators" (2021) (identifying

isolation, deception, and exploitation as key indicators of trafficking situations).

24. On or about December, 28th, 2024 Polina Rea exhibited symptoms consistent with being under the influence of unknown substances, including disorientation, impaired judgment, and physical weakness—symptoms commonly associated with substances used to facilitate human trafficking. See Exhibit E (Declaration of Medical Analysis of Documented Symptoms); see also *United States v. Benitez*, 741 F.3d 1312, 1318-19 (11th Cir. 2013) (discussing the use of controlled substances to facilitate human trafficking).

25. The following day, while still exhibiting symptoms of impairment, Polina Rea was taken by Defendant Shmertz onto an international cruise ship, despite not possessing a valid passport. This action effectively isolated her in international waters where she had no access to legal recourse or assistance, a tactic commonly employed in trafficking operations to establish control over victims. See Exhibit F (Declaration of Dakota Rea and Uber Cruise Port Records); see also *United States v. Dann*, 652 F.3d 1160, 1172 (9th Cir. 2011) (establishing that isolation and restriction of movement constitute elements of human trafficking).

26. The timing and circumstances of these events demonstrate a deliberate strategy of victim manipulation and control:

a. The sudden onset of symptoms consistent with substance impairment;

b. The immediate removal to international waters where legal protections are diminished;

c. The exploitation of immigration documentation vulnerabilities (possession of a green card but not a passport); and

d. The resulting state of dependence and vulnerability created through these coordinated actions.

27. Since these events, Defendant Shmertz has maintained control over Polina Rea through a combination of financial manipulation, psychological coercion, and exploitation of the dependencies created through his previous actions, constituting a continuing pattern of conduct that satisfies the elements of human trafficking as defined in 18 U.S.C. § 1591. See *United States v. Kozminski*, 487 U.S. 931, 952-53 (1988) (establishing that psychological coercion can constitute unlawful control over another person).

**D. The False Baker Act: A Retaliatory Entrapment Scheme**

28. On or about February 26th, 2025, Plaintiff published information on the professional networking platform LinkedIn exposing certain fraudulent

aspects of Defendants' business operations. See Exhibit G (Documentation of LinkedIn Post and Timeline).

29. Within hours of this publication, Defendant Shmertz, acting in concert with Polina Rea while she was under his coercive control, explicitly threatened Plaintiff stating that he would "make Plaintiff pay for it" unless the whistleblowing post was removed from LinkedIn, where Plaintiff had identified Shmertz to multiple anti-RICO crime fighting organizations including Interpol, ACAMS, and the FBI. This constituted a clear and actionable attempt at coercive silencing of a whistleblower through intimidation and threats. See Exhibit H (Documentation of Threats and Timeline of Communications); see also *Hustler Magazine v. Falwell*, 485 U.S. 46, 52 (1988) (establishing the constitutional protection of speech on matters of public concern); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345-46 (1974) (discussing the protection of speech regarding matters of public interest).

30. Later that same day, in a sequence of events that demonstrates clear temporal proximity and retaliatory intent, Plaintiff was subjected to involuntary commitment under Florida's Baker Act (§ 394.463, Florida Statutes). This commitment occurred under highly suspicious circumstances that suggest corruption and potential bribery of local law enforcement.

According to intelligence sources in the United Kingdom with whom Plaintiff has communicated, Defendant Shmertz allegedly bribed local police to circumvent proper protocols required for Baker Act proceedings. This involuntary commitment was executed despite Plaintiff not meeting any of the statutory criteria for such commitment, which requires "a substantial likelihood that without care or treatment the person will cause serious bodily harm to himself or herself or others in the near future, as evidenced by recent behavior." Additionally, suspiciously coinciding with these events, Robert Howkett, the Bishop of the Las Olas Ward of the Church of Jesus Christ of Latter-day Saints, made what Plaintiff alleges to be an entrapping and false allegation against Plaintiff that contributed to the fraudulent Baker Act commitment. This involvement of multiple parties in disparate positions suggests a coordinated effort to silence Plaintiff immediately following his public disclosure of Defendant Shmertz's activities. Plaintiff currently maintains an active lawsuit against the local police department for these violations of his constitutional rights. See Exhibit I (Documentation of Baker Act Proceedings and Medical Malpractice and Abuse); see also Exhibit I-1 (Declaration of Ongoing Litigation Against Law Enforcement); see also *O'Connor v. Donaldson*, 422 U.S. 563, 575 (1975) (establishing that

involuntary commitment cannot be utilized for purposes of retaliation or mere convenience).

31. The temporal proximity between Plaintiff's disclosure of Defendants' fraudulent activities and his involuntary commitment under circumstances that did not satisfy statutory requirements demonstrates a clear pattern of retaliatory action designed to silence whistleblowers—a pattern that directly mirrors the tactics employed by Defendant Shmertz in Russia, as documented in his criminal conviction. See *Addington v. Texas*, 441 U.S. 418, 432-33 (1979) (establishing that involuntary commitment requires clear and convincing evidence of mental illness and dangerousness); see also *O'Connor v. Donaldson*, 422 U.S. 563, 575 (1975) (establishing that involuntary commitment cannot be utilized for purposes of retaliation or mere convenience).

32. This pattern of retaliatory action against whistleblowers constitutes a form of "lawfare"—the weaponization of legal processes to silence legitimate criticism and disclosure of wrongdoing—and forms part of the broader pattern of racketeering activity alleged in this Complaint. See *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990) (recognizing the importance of protecting speech on matters of public concern); see also *BE&K*

*Construction Co. v. NLRB*, 536 U.S. 516, 525-26 (2002) (discussing the concept of sham litigation).

**E. The Use of Unfair Competition and Targeted Financial Retaliation**

33. Following Plaintiff's release from wrongful involuntary detention, Defendants escalated their pattern of retaliatory conduct through a coordinated campaign of commercial interference and unfair competition designed to damage Plaintiff's business interests and financial stability. See Exhibit J (Documentation of Business Interference and Financial Impacts).

34. This campaign of commercial interference included, but was not limited to:

a. The dissemination of false and defamatory statements regarding Plaintiff's mental health to business associates, clients, and potential partners, with the specific intent of undermining his commercial relationships. See *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995) (establishing standards for claims of tortious interference with business relationships).

b. The coordination and facilitation of the unlawful removal of Plaintiff's business assets, intellectual property, and essential business records through coercive control over Polina Rea. This includes the misappropriation of Plaintiff's Emotional Support Animals (ESAs), which were registered solely to Plaintiff

through the National Service Animal Registry and prescribed by Plaintiff's

physician as medically necessary. Defendant also is believed to have orchestrated a

disturbing cryptic text message sent to Plaintiff from a Miami phone number

showing a picture of a similar breed of cat as those taken from Plaintiff (white

Siberian Breed with White fur and blue eyes) stating "10 months coming soon"

which so happens to correspond with Defendants recent 10 month prison sentence

in Russia and also referred to this unknown cat in the picture who looked

frightened for its life as looking similar to "its father" insinuating that Plaintiffs

male cat who had been bred a few times as he may be hurt if Plaintiff continued

with his exposure of Defendant Shmertz further. See Exhibit K

On February 8, 2025, individuals acting under Defendants' direction wrongfully

removed these ESAs from Plaintiff's residence by fraudulently representing the

existence of a non-existent "protective order" regarding the animals. This

constitutes felony fraud under Florida law and demonstrates a pattern of using

emotionally significant assets as leverage against Plaintiff. See Exhibit K

(Documentation of Asset Removal and Valuation of Commercial Impact); see also

Exhibit K-1 (ESA Registration and Physician Documentation).

c. The targeted undercutting of Plaintiff's business opportunities through the

fraudulent operations of Beyond Research, BR Capital, and associated entities,

employing unfair competition practices as defined in Section 5 of the Federal

Trade Commission Act, 15 U.S.C. § 45. This occurred specifically as Plaintiff was

preparing to relaunch his NEON Energy Drink brand, which had previously broken

industry records and represents a significant competitive threat to established

beverage industry monopolies. See *FTC v. Sperry & Hutchinson Co.*, 405 U.S.

233, 244-45 (1972) (defining unfair competition practices).

d. The apparent forced participation of Polina Rea in a coordinated gaslighting

campaign whereby she has been compelled to read prepared scripts stating that she

is "okay" and that Plaintiff is "the problem"—a tactic consistent with documented

Russian "Pig Butchering" and psychological manipulation methodologies designed

to discredit whistleblowers. Suspiciously, Polina Rea's mother has been reported

missing since Polina's abduction, raising further concerns about coercion and

control. See Exhibit K-2 (Study of Coercive Control Tactics and Victim

Manipulation); see also *People v. Berry*, 556 P.2d 777, 781 (Cal. 1976) (discussing

psychological manipulation and its effects).

35. The systematic nature of these actions, their temporal relationship to

Plaintiff's disclosure of Defendants' fraudulent activities, and their targeted

impact on Plaintiff's commercial interests demonstrate a clear pattern of

retaliatory commercial interference that constitutes an independent predicate

act under RICO and also gives rise to claims under state and federal laws prohibiting unfair business practices. See *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 648-49 (2008) (establishing that direct reliance is not required for RICO claims predicated on mail or wire fraud).

## F. Money Laundering Operations Through Fraudulent Business Entities

36. Defendant's companies BR Capital, Beyond Research, DAOSquare, and T-Digital function collectively as an integrated money laundering operation designed to conceal the origins of fraudulently obtained funds, convert those funds into seemingly legitimate assets, and facilitate their transfer across jurisdictional boundaries to evade regulatory oversight and criminal investigation. See *United States v. Cuellar*, 553 U.S. 550, 561-62 (2008) (defining the concept of money laundering as including activities designed to conceal or disguise the nature, location, source, ownership, or control of proceeds of specified unlawful activity).

37. Forensic financial analysis has identified numerous indicators of money laundering activities within Defendants' operations, including:

a. The execution of structured transactions designed to evade reporting requirements under the Bank Secrecy Act, 31 U.S.C. § 5311 et seq. See Exhibit L (Analysis of Transaction Patterns and Regulatory Evasion).

b. The utilization of cryptocurrency exchanges with inadequate Know-Your-Customer (KYC) and Anti-Money Laundering (AML) protocols to facilitate the conversion of fiat currency to digital assets and vice versa, creating additional layers of transactional obscurity. See Financial Action Task Force (FATF), "Updated Guidance for a Risk-Based Approach to Virtual Assets and Virtual Asset Service Providers" (2021).

c. The establishment of complex corporate structures spanning multiple jurisdictions, including those known for banking secrecy and limited regulatory cooperation, to further obscure the ownership and movement of assets. See Exhibit M (Analysis of Corporate Structure and Cross-Jurisdictional Asset Movements).

d. The commingling of legitimate and illegitimate funds through businesses that have minimal or non-existent operational activities beyond their function as vehicles for financial transactions. See *United States v. Santos*, 553 U.S. 507, 513-14 (2008) (discussing the concept of "proceeds" in money laundering statutes).

38. The operation of these money laundering mechanisms is integral to Defendants' overall fraudulent scheme, as it enables them to:

a. Convert fraudulently obtained funds into assets that appear legitimate;

b. Transfer wealth across jurisdictional boundaries to evade regulatory oversight;

c. Fund ongoing fraudulent operations while concealing their illicit source; and

d. Establish financial leverage for purposes of control and coercion over victims.

39. These money laundering activities constitute independent predicate acts under RICO, 18 U.S.C. § 1956 (laundering of monetary instruments) and § 1957 (engaging in monetary transactions in property derived from specified unlawful activity), and further demonstrate the integrated nature of Defendants' criminal enterprise. See *United States v. Lazarenko*, 564 F.3d 1026, 1034 (9th Cir. 2009) (discussing the elements of money laundering as a predicate act for RICO purposes).

## G. Securities Fraud Through Misrepresentation and Ponzi-Like Structures

40. Defendants Revaz Shmertz and his companies BR Capital, Beyond Research, DAOSquare, and T-Digital have engaged in systematic securities fraud through the offering of investment opportunities that involve material misrepresentations regarding the nature, risk, and potential returns of these investments, in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. See Exhibit N (Documentation of Investment Offerings and Misrepresentations).

41. The investment opportunities offered by Defendants exhibit characteristics commonly associated with Ponzi schemes and other fraudulent investment structures, including:

a. Promises of extraordinary returns that significantly exceed market norms without corresponding risk disclosure;

b. Emphasis on recruiting new investors rather than generating legitimate business revenue;

c. Payment of returns to earlier investors using capital contributed by newer investors rather than from operational profits; and

d. Limited transparency regarding the actual use of invested funds. See *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946) (establishing the definition of an "investment contract" under securities laws); see also *SEC v. Edwards*, 540 U.S. 389, 394-95 (2004) (reaffirming and applying the Howey test).

42. These fraudulent investment offerings are integral to Defendants' overall scheme, as they:

a. Provide a mechanism for attracting capital that can be misappropriated;

b. Create an appearance of legitimate business activity to mask underlying fraud;

27

c. Establish relationships with victims that can be exploited for additional

fraudulent purposes; and

d. Generate documentation and paper trails that give a false impression of

regulatory compliance and business legitimacy.

43. These securities fraud activities constitute independent predicate acts under

RICO and give rise to separate claims under federal securities laws. See

*United States v. Zolp*, 479 F.3d 715, 718-19 (9th Cir. 2007) (discussing

securities fraud as a predicate act for RICO purposes).

**ADDITIONAL FACTUAL ALLEGATIONS REGARDING CORPORATE**

**COLLUSION AND ANTI-COMPETITIVE ACTIVITIES**

**A. The NEON Energy Drink Corporate Espionage Campaign**

40. The activities of Defendants must be understood within the broader context

of a decade-long corporate conspiracy specifically targeting Plaintiff's

NEON Energy Drink intellectual property and market position. This

conspiracy, as evidenced by the NEON Brief Dossier Summary (attached as

Exhibit O), involves major beverage industry players including MidOcean

Partners, Nutribolt (formerly Woodbolt), PepsiCo, Anheuser-Busch InBev,

and various affiliated entities.

41. Plaintiff conceived and founded NEON Energy Drink in 2010, securing domain registration and developing branding that would eventually distinguish the product in a crowded market. See Exhibit O (Documentation of NEON Energy Drink Founding and Initial Development). After successfully raising $1.1 million in investment capital, Plaintiff launched NEON Energy Drink in 2013, immediately attracting attention from industry competitors.

42. I n July 2014, Plaintiff, through his company Altairia Corporation, was forced to defend his NEON trademarks by filing an infringement lawsuit against Woodbolt Distribution, LLC, which had launched a competing product called "NEON Sport" despite having their trademark application denied multiple times by the United States Patent and Trademark Office (USPTO). See *Altairia Corp. v. Woodbolt Distribution, LLC*, Case No. A-14-CA-471-SS (W.D. Tex. 2014) (attached as Exhibit P).

43. Following a settlement agreement with Woodbolt in January 2015 that suspiciously included provisions attempting to restrict Plaintiff from entering the "retail market," Woodbolt's parent company, Nutribolt, received a "suspicious" investment exceeding $100 million from MidOcean Partners, whose Operating Partner John F. Brock III was the former CEO of Anheuser-Busch InBev and Coca-Cola. This investment occurred after

29

Woodbolt ceased selling their infringing "NEON Sport" product, suggesting that the settlement and subsequent investment were coordinated elements of a strategy to remove NEON Energy Drink from the market. See Exhibit Q (Documentation of Settlement Agreement and Subsequent Investment).

44. In 2019, Plaintiff discovered that Visalus, Inc., with whom he had entered into a royalty agreement for NEON, was fraudulently underreporting and underpaying royalties owed to Plaintiff. Plaintiff filed suit in New York for breach of contract, only to discover that Visalus had secretly made fraudulent agreements with Pruvit, another company, to divert funds from NEON sales. See Exhibit R (Documentation of Visalus Litigation).

45. Following these events, major beverage industry players including Anheuser-Busch InBev and PepsiCo launched products with "NEON" branding, including "NEON Burst" and "NEON Zebra," despite Plaintiff's established trademark rights. Particularly suspicious was the discovery that both "NEON Burst" and its partner brand "Sneak Energy - NEON Punch" contained ingredients from Cellucor, a product of Nutribolt, demonstrating continued coordination among these ostensibly separate entities to diminish and dilute Plaintiff's NEON trademark. See Exhibit S (Documentation of Infringing Products and Connections).

46. This pattern of corporate collusion, anti-competitive practices, and
trademark infringement represents an ongoing, coordinated campaign to
prevent Plaintiff's NEON Energy Drink from achieving market success,
either by keeping it off the retail market entirely or by diluting the
trademark's distinctiveness through unauthorized use. The involvement of
Defendant Shmertz and BR Capital in this campaign, as evidenced by BR
Capital's suspicious connections to Plaintiff's direct competitors, represents
the latest evolution of this conspiracy. See *Klor's, Inc. v. Broadway-Hale
Stores, Inc.*, 359 U.S. 207, 210-11 (1959) (addressing group boycotts and
concerted refusals to deal); *Fashion Originators' Guild of America v. FTC*,
312 U.S. 457, 465 (1941) (addressing industry-wide conspiracies to exclude
competitors).

## CAUSES OF ACTION

## COUNT I: VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. § 1962(c))

Against All Defendants

47. Plaintiff incorporates by reference the allegations set forth in paragraphs 1
through 46 above as if fully set forth herein.

31

48. This Count is brought pursuant to 18 U.S.C. § 1964(c) against all Defendants for violation of 18 U.S.C. § 1962(c).

49. At all relevant times, each Defendant was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

50. At all relevant times, the following constituted an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c): Defendants BR Capital, Beyond Research, DAOSquare, and T-Digital, together with other entities and individuals, including but not limited to Doe Defendants, associated in fact, although not a legal entity (the "Shmertz Enterprise").

51. Additionally, at all relevant times, the following constituted a separate but related "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c): Nutribolt (formerly Woodbolt), MidOcean Partners, Visalus, Inc., It Works Marketing, Inc., and other entities and individuals associated with the beverage industry who have engaged in a coordinated campaign to undermine Plaintiff's NEON Energy Drink brand through unfair competition, trademark infringement, and corporate espionage (the "Beverage Industry Enterprise").

52. The Shmertz Enterprise and the Beverage Industry Enterprise have, upon information and belief, operated in coordination to further their mutual interests in preventing Plaintiff's NEON Energy Drink from successfully re-

entering the market or diminishing the value of Plaintiff's intellectual property through coordinated acts of fraud, unfair competition, and commercial interference.

53. The Shmertz Enterprise constitutes an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), as it is an association in fact of individuals and corporations that has engaged in, and whose activities affect, interstate and foreign commerce. The members of the Shmertz Enterprise function as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity, and each Defendant participates in the Shmertz Enterprise through a defined role. See *Boyle v. United States*, 556 U.S. 938, 944-46 (2009) (establishing that a RICO enterprise must have at minimum a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose).

54. The Beverage Industry Enterprise similarly constitutes an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), as it is an association in fact of corporations and individuals that has engaged in, and whose activities affect, interstate and foreign commerce. Despite operating in ostensibly competitive positions within the same industry, the members of the Beverage Industry Enterprise have coordinated their activities

specifically to target Plaintiff's NEON Energy Drink brand through a pattern of anti-competitive conduct. See *United States v. Turkette*, 452 U.S. 576, 583 (1981) (holding that RICO applies to both legitimate and illegitimate enterprises); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497-98 (1985) (discussing the scope of RICO's application to various enterprise structures).

55. Each Defendant has conducted or participated, directly or indirectly, in the conduct, management, or operation of the Shmertz Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c). This pattern of racketeering activity includes multiple, related acts of:

a. Mail fraud, in violation of 18 U.S.C. § 1341;

b. Wire fraud, in violation of 18 U.S.C. § 1343;

c. Financial institution fraud, in violation of 18 U.S.C. § 1344;

d. Laundering of monetary instruments, in violation of 18 U.S.C. § 1956;

e. Engaging in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. § 1957;

f. Fraud in the sale of securities, in violation of 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5; and

g. Human trafficking, in violation of 18 U.S.C. § 1591.

50. The acts of racketeering activity committed by Defendants are related in that they have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events. They amount to and pose a threat of continued criminal activity, as the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future and also form part of Defendants' regular way of doing business. See *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239-40 (1989) (defining the "continuity" requirement for a pattern of racketeering activity).

51. As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in his business and property in an amount to be determined at trial, but which exceeds $3,000,000. Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble damages, plus costs and attorneys' fees, from Defendants.

**COUNT II: CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. § 1962(d))**

Against All Defendants

52. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 51 above as if fully set forth herein.

53. This Count is brought pursuant to 18 U.S.C. § 1964(c) against all Defendants for violation of 18 U.S.C. § 1962(d).

54. Defendants have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Shmertz Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

55. Each Defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Shmertz Enterprise. See *Salinas v. United States*, 522 U.S. 52, 63-64 (1997) (establishing that a RICO conspiracy does not require proof that the defendant committed or agreed to commit two or more predicate acts, but rather only that the defendant adopted the goal of furthering or facilitating the criminal endeavor).

56. Each Defendant agreed to further, facilitate, or participate in the conspiracy to operate the Shmertz Enterprise through a pattern of racketeering activity, as evidenced by:

a. The coordinated establishment and operation of multiple fraudulent shell companies;

b. The systematic implementation of victim recruitment methodologies;

c. The coordinated application of coercive entrapment tactics against whistleblowers;

d. The integrated operation of money laundering mechanisms; and

e. The collaborative execution of securities fraud through misrepresentation and Ponzi-like structures.

57. As a direct and proximate result of the Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff has been injured in his business and property in an amount to be determined at trial, but which exceeds $3,000,000. Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble damages, plus costs and attorneys' fees, from Defendants. See *Beck v. Prupis*, 529 U.S. 494, 506-07 (2000) (recognizing the availability of civil remedies for injuries caused by an overt act performed in furtherance of a RICO conspiracy).

**COUNT III: WIRE FRAUD (18 U.S.C. § 1343)**

Against All Defendants

58. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 57 above as if fully set forth herein.

59. This Count is brought against all Defendants for violation of the federal wire fraud statute, 18 U.S.C. § 1343, which prohibits the use of interstate wire facilities to further a scheme to defraud.

60. Each Defendant, with specific intent to defraud, devised, participated in, and executed a scheme to defraud Plaintiff and others by means of materially false and fraudulent pretenses, representations, and promises, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises.

61. For the purpose of executing the scheme to defraud, Defendants transmitted and caused to be transmitted by means of wire communications in interstate and foreign commerce writings, signs, signals, pictures, and sounds, in violation of 18 U.S.C. § 1343. These wire communications included, but were not limited to:

a. Electronic communications containing materially false and misleading information regarding the nature, legitimacy, and financial stability of Beyond Research, BR Capital, DAOSquare, and T-Digital;

b. Electronic transfers of funds obtained through fraudulent misrepresentations;

c. Digital communications containing false and misleading information designed to recruit victims into the fraudulent scheme;

d. Electronic communications containing threats and coercive statements designed to silence whistleblowers and maintain control over victims; and

e. Digital transmissions of fraudulent corporate records and financial statements designed to create the appearance of legitimate business operations.

62. Each electronic communication and transfer constitute a separate violation of 18 U.S.C. § 1343. See *United States v. Giovenco*, 773 F.3d 866, 868 (7th Cir. 2014) (affirming that each wire transmission in furtherance of a scheme to defraud constitutes a separate violation of the wire fraud statute).

63. As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1343, Plaintiff has suffered substantial economic damages, including but not limited to financial losses, damage to business reputation, and costs associated with remediation efforts, in an amount to be determined at trial, but which exceeds $3,000,000. See *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 648-49 (2008) (establishing that a plaintiff may recover

for injuries proximately caused by wire fraud without proving first-party
reliance).

## COUNT IV: MAIL FRAUD (18 U.S.C. § 1341)

Against All Defendants

64. Plaintiff incorporates by reference the allegations set forth in paragraphs 1
through 63 above as if fully set forth herein.

65. This Count is brought against all Defendants for violation of the federal
mail fraud statute, 18 U.S.C. § 1341, which prohibits the use of the United
States mail or private interstate carriers to further a scheme to defraud.

66. Each Defendant, with specific intent to defraud, devised, participated in,
and executed a scheme to defraud Plaintiff and others by means of
materially false and fraudulent pretenses, representations, and promises, and
for obtaining money and property by means of materially false and
fraudulent pretenses, representations, and promises.

67. For the purpose of executing the scheme to defraud, Defendants placed in
any post office or authorized depository for mail matter, any matter or thing
to be sent or delivered by the Postal Service, or deposited or caused to be
deposited any matter or thing to be sent or delivered by any private or
commercial interstate carrier, or took or received therefrom, any such matter

or thing, or knowingly caused to be delivered by mail or such carrier

according to the direction thereon, or at the place at which it is directed to be

delivered by the person to whom it is addressed, any such matter or thing, in

violation of 18 U.S.C. § 1341. These mailings included, but were not limited

to:

a. Physical documents containing materially false and misleading information

regarding the nature, legitimacy, and financial stability of Beyond Research, BR

Capital, DAOSquare, and T-Digital;

b. Physical financial instruments obtained through fraudulent misrepresentations;

c. Physical marketing materials containing false and misleading information

designed to recruit victims into the fraudulent scheme;

d. Physical communications containing threats and coercive statements designed to

silence whistleblowers and maintain control over victims; and

e. Physical corporate records and financial statements designed to create the

appearance of legitimate business operations.

68. Each mailing constitutes a separate violation of 18 U.S.C. § 1341. See

*United States v. Greenberg*, 835 F.3d 295, 306 (2d Cir. 2016) (establishing

that each mailing in furtherance of a scheme to defraud constitutes a separate violation of the mail fraud statute).

69. As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1341, Plaintiff has suffered substantial economic damages, including but not limited to financial losses, damage to business reputation, and costs associated with remediation efforts, in an amount to be determined at trial, but which exceeds $3,000,000. See *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 648-49 (2008) (establishing that a plaintiff may recover for injuries proximately caused by mail fraud without proving first-party reliance).

## COUNT V: SECURITIES FRAUD (15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5)

Against All Defendants

70. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 69 above as if fully set forth herein.

71. This Count is brought against all Defendants for violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, which prohibit fraud in connection with the purchase or sale of securities.

72. Each Defendant, directly or indirectly, by the use of means or
instrumentalities of interstate commerce, or of the mails, or of facilities of
national securities exchanges, in connection with the purchase or sale of
securities, knowingly or recklessly:

a. Employed devices, schemes, or artifices to defraud;

b. Made untrue statements of material facts or omitted to state material facts
necessary in order to make the statements made, in light of the circumstances
under which they were made, not misleading; and/or

c. Engaged in acts, practices, or courses of business which operated or would
operate as a fraud or deceit upon other persons, including purchasers and sellers of
securities.

73. The fraudulent investment offerings provided by Defendant's BR Capital,
Beyond Research, DAOSquare, and T-Digital constitute "securities" within
the meaning of Section 3(a)(10) of the Securities Exchange Act of 1934, 15
U.S.C. § 78c(a)(10), as they are "investment contracts" under the test
established in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946), which
defines an investment contract as a "transaction or scheme whereby a person

invests his money in a common enterprise and is led to expect profits solely

from the efforts of the promoter or a third party."

74. The fraudulent conduct of Defendants in connection with these securities

offerings included, but was not limited to:

a. Misrepresenting the financial condition, operational status, and business

activities of Beyond Research, BR Capital, DAOSquare, and T-Digital;

b. Misrepresenting the nature and level of risk associated with investments in their

enterprises;

c. Misrepresenting the expected returns on investments and the source of funds

used to pay such returns;

d. Omitting material information regarding Defendant Shmertz's prior criminal

conviction for fraud and the true nature of the businesses' operations; and

e. Creating and distributing false and misleading financial statements, business

plans, and investment prospectuses.

75. Each Defendant acted with scienter, as evidenced by their knowing and

intentional conduct in creating and executing the fraudulent scheme, their

deliberate effort to conceal material information, and their specific intent to

deceive investors and misappropriate their funds. See *Ernst & Ernst v.*

*Hochfelder*, 425 U.S. 185, 193 (1976) (establishing that scienter is a required element for private causes of action under Section 10(b) and Rule 10b-5); see also *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319-20 (2007) (defining scienter as "a mental state embracing intent to deceive, manipulate, or defraud").

76. As a direct and proximate result of Defendants' violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5, Plaintiff has suffered substantial economic damages, including but not limited to financial losses, damage to business reputation, and costs associated with remediation efforts, in an amount to be determined at trial, but which exceeds $3,000,000. See *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005) (discussing the elements of causation in securities fraud cases).

## COUNT VI: MONEY LAUNDERING (18 U.S.C. §§ 1956 and 1957)

Against All Defendants

77. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 76 above as if fully set forth herein.

78. This Count is brought against all Defendants for violations of the federal money laundering statutes, 18 U.S.C. §§ 1956 and 1957, which prohibit

various financial transactions involving the proceeds of specified unlawful activities.

79. Each Defendant knowingly conducted and attempted to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activities, specifically proceeds from wire fraud (18 U.S.C. § 1343), mail fraud (18 U.S.C. § 1341), and securities fraud (15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5), knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activities, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

80. Each Defendant knowingly engaged and attempted to engage in monetary transactions in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activities, specifically wire fraud (18 U.S.C. § 1343), mail fraud (18 U.S.C. § 1341), and securities fraud (15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5), in violation of 18 U.S.C. § 1957.

81. The financial transactions conducted by Defendants in furtherance of their money laundering activities included, but were not limited to:

a. Transfers of funds between accounts controlled by different corporate entities within the Shmertz Enterprise;

b. Conversion of fiat currency to cryptocurrency and vice versa through exchanges with limited regulatory oversight;

c. International wire transfers to accounts in jurisdictions with banking secrecy laws and limited cooperation with international financial investigations;

d. Structuring of transactions to evade reporting requirements under the Bank Secrecy Act, 31 U.S.C. § 5311 et seq.; and

e. The commingling of legitimate and illegitimate funds to obscure the source and nature of the proceeds of specified unlawful activities.

82. Each financial transaction constitutes a separate violation of 18 U.S.C. §§ 1956 and/or 1957. See *United States v. Prescott*, 42 F.3d 1165, 1167 (8th Cir. 1994) (affirming that each transaction involving the proceeds of specified unlawful activities can constitute a separate violation of the money laundering statutes).

83. As a direct and proximate result of Defendants' violations of 18 U.S.C. §§ 1956 and 1957, Plaintiff has suffered substantial economic damages, including but not limited to financial losses, damage to business reputation, and costs associated with remediation efforts, in an amount to be determined at trial, but which exceeds $3,000,000. See *United States v. Santos*, 553 U.S. 507, 513-14 (2008) (discussing the concept of "proceeds" in money laundering statutes); see also *United States v. Lazarenko*, 564 F.3d 1026, 1034 (9th Cir. 2009) (discussing the elements of money laundering as a predicate act for RICO purposes).

## COUNT VII: HUMAN TRAFFICKING AND FORCED LABOR (18 U.S.C. §§ 1589 and 1590)

Against Defendant Shmertz

84. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 83 above as if fully set forth herein.

85. This Count is brought against Defendant Shmertz for violations of 18 U.S.C. § 1589 (forced labor) and § 1590 (trafficking with respect to forced labor), which prohibit the provision or obtaining of labor or services through various forms of coercion and the trafficking of persons for such purposes.

86. Defendant Shmertz knowingly provided and obtained the labor and services of Polina Rea by means of:

a. Force, threats of force, physical restraint, and threats of physical restraint to her;

b. Serious harm and threats of serious harm to her;

c. The abuse and threatened abuse of law and legal process against her; and/or

d. A scheme, plan, and pattern intended to cause her to believe that, if she did not perform such labor or services, she would suffer serious harm or physical restraint.

87. Defendant Shmertz knowingly recruited, harbored, transported, provided, and/or obtained Polina Rea for labor or services in violation of 18 U.S.C. § 1589.

88. The actions taken by Defendant Shmertz to establish and maintain control over Polina Rea included, but were not limited to:

a. Administering or causing to be administered substances that impaired her judgment and capacity for independent decision-making, creating symptoms consistent with opioid-like sedation;

b. Transporting her onto an international cruise ship while she was under the influence of such substances and without a valid passport (only a green card),

effectively isolating her in international waters where she had no access to legal recourse or assistance;

c. Utilizing her immigration status (green card holder without a passport) to restrict her freedom of movement and create a state of dependency;

d. Employing threats of legal action, deportation, and other forms of coercion to maintain control over her;

e. Exploiting the relationships and dependencies created through these actions to compel her participation in fraudulent financial activities and the removal of Plaintiff's business assets; and

f. Isolating her from contact with her family, as evidenced by the suspicious disappearance of Polina Rea's mother since Polina's abduction, thereby eliminating potential support systems that could facilitate her escape from Defendant Shmertz's control.

89. Polina Rea, a recent graduate from a Russian university who had been working as a respected teacher prior to falling under Defendant Shmertz's influence, has exhibited dramatic behavioral changes consistent with victims of coercive control and psychological manipulation. Her current participation in what appears to be scripted communications designed to

discredit Plaintiff follows established patterns of victim exploitation in human trafficking operations. See *United States v. Calimlim*, 538 F.3d 706, 712 (7th Cir. 2008) (discussing psychological isolation and manipulation as elements of human trafficking); *United States v. Bradley*, 390 F.3d 145, 150-52 (1st Cir. 2004) (addressing psychological coercion in trafficking cases).

90. The actions of Defendant Shmertz satisfy the elements of human trafficking and forced labor as established in *United States v. Kozminski*, 487 U.S. 931, 952-53 (1988) (establishing that psychological coercion can constitute unlawful control over another person) and further developed in *United States v. Dann*, 652 F.3d 1160, 1169-70 (9th Cir. 2011) (establishing that coercion through deceptive recruitment constitutes trafficking).

91. As a direct and proximate result of Defendant Shmertz's violations of 18 U.S.C. §§ 1589 and 1590, Plaintiff has suffered substantial economic damages, including but not limited to financial losses resulting from the coerced removal of his business assets by Polina Rea while under Defendant Shmertz's control, in an amount to be determined at trial, but which exceeds $3,000,000. See *Ditullio v. Boehm*, 662 F.3d 1091, 1096-98 (9th Cir. 2011) (discussing the scope of damages available under the Trafficking Victims Protection Act).

## COUNT VIII: VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (Fla. Stat. §§ 501.201 et seq.)

Against All Defendants

91. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 90 above as if fully set forth herein.

92. This Count is brought against all Defendants for violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201 et seq.

93. Each Defendant is engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

94. Plaintiff is a "consumer" as defined by Fla. Stat. § 501.203(7) and has standing to bring this action pursuant to Fla. Stat. § 501.211 for the unfair and deceptive acts and practices of Defendants.

95. Defendants have engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of their trade or commerce, in violation of Fla. Stat. § 501.204(1), including but not limited to:

a. Misrepresenting the nature, characteristics, and qualities of their businesses, products, and services;

b. Engaging in false and misleading advertising regarding their businesses, products, and services;

c. Disseminating false and defamatory statements regarding Plaintiff's mental health to business associates, clients, and potential partners, with the specific intent of undermining his commercial relationships;

d. Facilitating the unlawful removal of Plaintiff's business assets, intellectual property, and essential business records through coercive control over Polina Rea; and

e. Engaging in targeted undercutting of Plaintiff's business opportunities through the fraudulent operations of Beyond Research, BR Capital, and associated entities.

96. These unfair and deceptive acts and practices were likely to, and did, deceive consumers acting reasonably under the circumstances, to their detriment.

97. Defendants knew or should have known that their conduct violated FDUTPA, particularly in light of Defendant Shmertz's prior conviction for fraud and the clear illegality of their actions under Florida law.

98. As a direct and proximate result of Defendants' violations of FDUTPA, Plaintiff has suffered substantial actual damages, including but not limited to

financial losses, damage to business reputation, and costs associated with remediation efforts, in an amount to be determined at trial, but which exceeds $3,000,000. See *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006) (discussing the scope of damages available under FDUTPA).

99. Plaintiff is entitled to recover his actual damages, plus attorneys' fees and court costs, pursuant to Fla. Stat. § 501.211(2).

100.    Plaintiff further requests declaratory and injunctive relief pursuant to Fla. Stat. § 501.211(1) to prevent Defendants from continuing to engage in unfair and deceptive trade practices.

## COUNT IX: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS

Against All Defendants

101.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 100 above as if fully set forth herein.

102.    Plaintiff had valid business relationships with various clients, partners, vendors, and other third parties, with the probability of future economic benefit to Plaintiff. Defendants had knowledge of these business relationships. See Exhibit J (Documentation of Business Relationships and Interference).

103.     Defendants intentionally and unjustifiably interfered with Plaintiff's business relationships by engaging in a coordinated campaign of commercial interference designed to damage Plaintiff's business interests and financial stability, including but not limited to:

a. Disseminating false and defamatory statements regarding Plaintiff's mental health to business associates, clients, and potential partners, with the specific intent of undermining his commercial relationships;

b. Facilitating the unlawful removal of Plaintiff's business assets, intellectual property, and essential business records through coercive control over Polina Rea; and

c. Engaging in targeted undercutting of Plaintiff's business opportunities through the fraudulent operations of Beyond Research, BR Capital, and associated entities.

104.     The interference by Defendants was willful and intentional, with the purpose of injuring Plaintiff's business and improving their own competitive position through wrongful means.

105.     As a direct and proximate result of Defendants' tortious interference with Plaintiff's business relationships, Plaintiff has suffered substantial economic damages, including but not limited to lost business opportunities,

damage to business reputation, and costs associated with remediation efforts, in an amount to be determined at trial, but which exceeds $3,000,000. See *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994) (establishing the elements of tortious interference with business relationships under Florida law).

## COUNT X: CIVIL CONSPIRACY

Against All Defendants

106.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 105 above as if fully set forth herein.

107.    Defendants entered into an agreement to commit various unlawful acts, including but not limited to wire fraud, mail fraud, securities fraud, money laundering, human trafficking, and tortious interference with business relationships, as detailed throughout this Complaint.

108.    In furtherance of this conspiracy, Defendants committed numerous overt acts, including but not limited to:

a. Establishing and operating fraudulent shell companies, with Beyond Research Labs specifically formed shortly after Defendant Shmertz's release from prison in Russia;

b. Implementing sophisticated victim recruitment methodologies through entities sharing addresses with modeling agencies—a well-documented red flag for human trafficking operations;

c. Applying coercive entrapment tactics against whistleblowers, including the fraudulent invocation of Florida's Baker Act against Plaintiff within hours of his public disclosure of Defendants' fraudulent activities;

d. Operating integrated money laundering mechanisms through complex corporate structures spanning multiple jurisdictions;

e. Executing securities fraud through misrepresentation and Ponzi-like structures; and

f. Conducting a coordinated campaign of commercial interference against Plaintiff.

109.     The conspiracy extends beyond the named Defendants to include members of the Beverage Industry Enterprise, who have acted in coordination with Defendants to:

a. Systematically undermine Plaintiff's NEON Energy Drink brand through anti-competitive practices, including coordinated trademark infringement activities by multiple ostensibly competing beverage companies;

b. Execute legal sabotage in the Altairia v. It Works case, including the suspicious withdrawal of Plaintiff's legal representation immediately prior to mediation after successfully defeating early dismissal motions, suggesting potential corruption or collusion within the Florida legal system;

c. Systematically block Plaintiff's distribution deals and retail market access, including through restrictive settlement provisions specifically designed to prevent market entry; and

d. Maintain a coordinated campaign of corporate espionage against Plaintiff and his NEON Energy Drink intellectual property spanning more than a decade.

110.    The temporal proximity between Plaintiff's public disclosure of Defendant Shmertz's fraudulent activities on LinkedIn and his subsequent fraudulent Baker Act commitment, combined with Defendants' explicit threats to "make Plaintiff pay for it," demonstrates both the existence of the conspiracy and specific overt acts taken in furtherance thereof. See *Interstate Circuit v. United States*, 306 U.S. 208, 226-27 (1939) (establishing that conspiracy can be inferred from parallel conduct and circumstances suggesting concerted action).

111.    As a direct and proximate result of Defendants' civil conspiracy and the overt acts committed in furtherance thereof, Plaintiff has suffered

substantial economic damages, including but not limited to financial losses, damage to business reputation, and costs associated with remediation efforts, in an amount to be determined at trial, but which exceeds $3,000,000. See *Charles v. Florida Foreclosure Placement Center, LLC*, 988 So. 2d 1157, 1159-60 (Fla. 3d DCA 2008) (establishing the elements of civil conspiracy under Florida law).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants, jointly and severally, as follows:

A. Awarding compensatory damages in favor of Plaintiff against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, but in no event less than $3,000,000;

B. Awarding treble damages for Plaintiff's RICO claims pursuant to 18 U.S.C. § 1964(c);

C. Awarding punitive damages in favor of Plaintiff in an amount to be determined at trial, but sufficient to punish Defendants for their illegal conduct and to deter similar conduct in the future;

D. Preliminarily and permanently enjoining Defendants and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, from:

1. Continuing to operate Beyond Research, BR Capital, DAOSquare, T-Digital, or any other entity involved in the fraudulent scheme detailed in this Complaint;

2. Soliciting or accepting any investments or funds from any person or entity;

3. Transferring, dissipating, or otherwise disposing of any funds, assets, or property related to or derived from the fraudulent scheme detailed in this Complaint;

4. Destroying, mutilating, concealing, altering, or disposing of any books, records, documents, correspondence, memoranda, or other written communications of any kind, whether in paper, electronic, or any other form or medium, that relate in any way to the fraudulent scheme detailed in this Complaint;

5. Contacting, threatening, intimidating, or otherwise interfering with Plaintiff, Polina Rea, Plaintiffs legally registered and medically prescribed Emotional Support Animals or any other potential witness in this action; and

6. Engaging in any further unfair or deceptive business practices in violation of FDUTPA.

E. Ordering an immediate freeze of all financial accounts and assets held by or for the benefit of any Defendant, including but not limited to bank accounts, brokerage accounts, cryptocurrency wallets, real property, and personal property of significant value;

F. Ordering expedited discovery and the immediate production of all books, records, documents, correspondence, memoranda, or other written communications of any kind, whether in paper, electronic, or any other form or medium, that relate in any way to the fraudulent scheme detailed in this Complaint;

G. Ordering a court-supervised forensic audit of all financial accounts and transactions associated with Defendants and the fraudulent scheme detailed in this Complaint;

H. Referring this matter to the Federal Bureau of Investigation, the Securities and Exchange Commission, the Internal Revenue Service, and the Department of Justice for investigation and potential criminal prosecution;

I. Awarding Plaintiff prejudgment interest at the maximum rate allowable by law;

J. Awarding Plaintiff his reasonable attorneys' fees and costs incurred in this action, including expert witness fees, pursuant to 18 U.S.C. § 1964(c), Fla. Stat. § 501.211(2), and any other applicable provision of law; and

K. Ordering Defendant to Return Plaintiffs Registered Emotional Support Animals and monetary damages suffered from the emotional duress suffered by Plaintiff for removing them from his care.

L. Granting such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted this _19th_ day of _March_, 2025.

**VERIFICATION**

I, **Dakota Rea**, under penalty of perjury pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am the **Plaintiff** in the above-captioned action.

2. I have reviewed the **Verified Complaint for Damages, Permanent Injunctive Relief, Asset Freezes, Expedited Discovery, and Referral for Federal Investigation**, and I am familiar with its contents.

3. The statements made in the Verified Complaint are true and correct to the best of my personal knowledge, except for those matters stated on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the **United States of America** that the foregoing is true and correct to the best of my personal knowledge and belief.

**Executed on this** _14th_ day of _March_, 2025, **in London, England, United Kingdom**

By:

**Dakota Rea**

[Plaintiff, Pro Se]

## CERTIFICATE OF SERVICE

I hereby certify that on this _14th_ day of _March_____, 2025, a true and correct copy of the foregoing **Verification** was served via Certified Mail and or Electronic Filing System upon:

**REVAZ SHMERTZ,**

an individual,

SHMERTZ, REVAZ

1801 N.E. 123RD STREET, SUITE 314

NORTH MIAMI, FL 33181

**BEYOND RESEARCH LABS, LLC**

a Florida Limited Liability Company

ATT: SHMERTZ, REVAZ

1801 N.E. 123RD STREET, SUITE 314

NORTH MIAMI, FL 33181

**By:** _____

**Dakota Rea, Pro Se**

401 E Las Olas Blvd STE 130-397

Fort Lauderdale, FL 33301 USA